IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
JUDGE WALKER D. MILLER

Civil Action No. 05-cv-646-WDM-MJW

BROTHERHOOD OF MAINTENANCE OF WAY EMPLOYES DIVISION/IBT,

    Plaintiff,

v.

UNION PACIFIC RAILROAD CO.,

    Defendant.

_____

**ORDER**
_____

Miller, J.

This matter is before me on the defendant's Motion for a Preliminary Injunction, filed April 18, 2005, and Motion to Dismiss Amended Complaint for Lack of Subject Matter Jurisdiction, filed June 24, 2005. Having considered the motions, responses, evidence, and oral argument, I find that both motions should be granted upon conditions.

Background

Plaintiff Brotherhood of Maintenance of Way Employes [Sic] Division/IBT (BMWED) filed this complaint against Union Pacific Railroad (UP) seeking an order declaring that UP has violated Section 2 Seventh of the Railway Labor Act (RLA), 45 U.S.C. § 152 Seventh, by abrogating and unilaterally changing a collective bargaining agreement (CBA) with BMWED. UP has filed a counterclaim seeking an order

enjoining BMWED from striking.

UP is a railroad operating in the western and central United States. BMWED is a labor organization that is the collective bargaining representative of UP employees responsible for maintaining, repairing, and inspecting railroad tracks and other railroad facilities. UP and BMWED are parties to several CBAs, including agreements that cover different portions of UP's railway system. For instance, one agreement (the "UP Proper Agreement") covers BMWED-represented employees who work on the "UP Proper," which covers rail-lines extending generally into the western and northwestern continental United States.[1] Another agreement ("the MPRR Agreement")[2], covers BMWED-represented employees who work on the "Southern Division," which has lines traversing the central and south-central continental United States. Finally, UP and BMWED are parties to an-industry-wide CBA dated February 7, 1965 ("the Feb. 7th Agreement"), which provides, among other things, that carriers such as UP "have the right to transfer work and/or transfer employees throughout the system which do not require the crossing of craft lines." (Def.'s Ex. 3, at 3.)

This dispute revolves around whether UP may use "pre-plated rail ties" and "pre-fabricated track panels" produced by non-BMWED-represented employees for use on its lines in the UP Proper. Track construction and maintenance involves the affixing of

---

[1] The "UP Proper" consists of UP's original lines, plus the line of the former Denver & Rio Grande Western Railroad. The UP Proper runs from Council Bluffs, Iowa, to Salt Lake City, Utah, and from there extends both northwest, to Seattle, Washington, and southwest, to Yermo, California.

[2] The agreement is so named because UP acquired the territory constituting the Southern Division through a merger with the Missouri Pacific Railroad.

rails to ties.  The actual creation of a segment of track is referred to as "fabrication," during which two rails are attached to wooden ties to create a section of track.  A necessary component of this is "plating" the ties, or attaching plates to the ties by which the rail may be fastened to the tie.

Rule 9 of the UP Proper agreement provides that "[c]onstruction and maintenance of roadway and track, such as rail laying, tie renewals, ballasting, surfacing and lining tack, fabrication of track panels...and other work incidental thereto will be performed by forces in the Track Subdepartment."  (Naro Decl., Ex. 1, at 15.)  In 1999, UP announced that it would begin purchasing pre-fabricated track panels for use on the UP Proper, and would no longer need its plant in Laramie, Wyoming, staffed by BMWED-represented employees, to fabricate track panels.  BMWED filed suit, which was dismissed as a "minor dispute" under the RLA, thus necessitating compulsory arbitration procedures.  *See Bhd of Maint. of Way Employees v. Union Pac. R.R. (BMWED I)*, 19 Fed. Appx. 731, 731 (10th Cir. Dec. 21, 2000) (unpublished table decision).  However, in arbitration, an arbitration board headed by Gerald Wallin generally agreed with BMWED that UP's purchase of pre-fabricated track panels violated Rule 9 of the UP Proper Agreement (the "Wallin Award").

In 2002, BMWED learned that UP had purchased and was installing pre-plated ties on the UP Proper.  The parties submitted the dispute to an arbitration board headed by Herbert Fishgold, and on April 30, 2003, the board found in favor of BMWED, holding that purchase of pre-plated ties made by a third party violated Rule 9 (the "Fishgold Award").

3

On December 2, 2003, UP provided BMWED with notice under the Feb. 7th Agreement that it was transferring all tie pre-plating and track panel pre-fabrication work being performed on the UP Proper to its North Little Rock, Arkansas panel plant in UP's Southern Division, where the MPPR Agreement was in force.  In the letter, UP noted that "[s]uch work will be performed by employees coming under the jurisdiction of the collective bargaining agreement between Union Pacific and the Brotherhood of Maintenance of Way Employes [sic] dated July 1, 2000."  (Naro Decl., Ex. 7.)  UP asserts, and BMWED does not deny, that in the Southern Division UP has a long-standing practice of purchasing pre-plated ties from third parties, a practice in which BMWED has acquiesced.  Although the Feb. 7th Agreement gave BMWED the right to protest the transfer–which would have resulted in arbitration–BMWED did not do so.

As a result of the transfer, ties and track panels that were pre-plated and pre-fabricated by persons other than UP Proper BMWED-represented employees began to be installed on the UP Proper.  BMWED subsequently filed suit in this court, alleging that UP had violated the Fishgold Award by (1) installing ties that, although pre-plated, were re-plated; (2) allowing pre-plated ties, although not installed, to lay in yards near railways; and (3) failing to instruct its engineering department and field managers regarding the Fishgold Award's requirements with regards to installation of pre-plated ties.  Because the specifically disputed actions were not directly addressed by the Fishgold Award, the assigned judge, Judge Nottingham, found that a decision on the merits would require him to interpret both the award and the UP Proper Agreement, and that he lacked subject matter jurisdiction.  *See Bhd of Maint. of Way Employees v.*

4

*Union Pac. R.R.*, No. 04-N-239, at *12-13 (D. Colo. Jan. 27, 2005) (*BMWED II*). In doing so, he noted in a footnote that he would have to interpret the Fishgold Award and CBA to accept Defendant's position that the transfer of work to the Southern Division mooted the Fishgold Award. *Id.* at *12-13 n.5.

Meanwhile, in 2004, BMWED had learned that UP had entered an arrangement under which a company named Nevada RR set up a facility in UP's North Little Rock yard where Nevada RR produced pre-plated ties which it provided to UP. By Spring 2005, BMWED had confirmed that UP was buying pre-plated ties for installation on UP Proper lines, and that these ties had been wholly or partially fabricated by Nevada RR employees which were not BMWED represented. On April 7, 2005 it filed suit. Its amended complaint alleges that, by installing on the UP Proper pre-plated rail ties produced by Nevada RR, UP has violated and effected a unilateral change of the UP Proper Agreement, as well as violated its commitment in its December 2, 2003 letter that the transferred work would be performed by BMWED-represented employees. UP now moves for dismissal, arguing that because this is a minor dispute under the RLA, I lack subject matter jurisdiction. Additionally, UP moves for a preliminary injunction enjoining BMWED from striking. I first address the motion to dismiss.

1. <u>Motion to Dismiss</u>

<u>Standard of Review</u>

Under Fed. R. Civ. P. 12(b)(1), a motion to dismiss should be granted if the court does not have subject matter jurisdiction over the case. A motion to dismiss for lack of subject matter jurisdiction may constitute either a facial or factual challenge. *United*

*States v. Holt*, 46 F.3d 1000, 1002 (10th Cir. 1995). "Where, as here, a party attacks the factual basis for subject matter jurisdiction, the court may not presume the truthfulness fo the factual allegations in the complaint, but may consider evidence to resolve disputed jurisdictional facts." *SK Finance SA v. La Plata County, Bd of County Comm'rs*, 126 F.3d 1272, 1275 (10th Cir. 1997). When a defendant brings a motion to dismiss under Rule 12(b)(1), the plaintiff carries the burden of proving the court's jurisdiction. *Beams v. Norton*, 327 F.Supp.2d 1323, 1327 (D.Kan. 2004). *See also Amoco Rocmount Co. v. Anschutz Corp.*, 7 F.3d 909, 914 (10th Cir.), *cert. denied*, 510 U.S. 1112 (1994) (the party asserting jurisdiction bears the burden of proving the existence of diversity jurisdiction once it is challenged).

## Discussion

"The RLA provides a mandatory arbitration system for settling two classes of labor disputes: 'major disputes' which 'seek to create contractual rights,' or 'minor disputes' which enforce them." *BMWE I*, 19 Fed. Appx. 731, at * 2 (*quoting Consolidated Rail Corp. v. Railway Labor Executives' Ass'n* ("*Conrail*"), 491 U.S. 299, 302 (1989)). The classification of a dispute is pertinent because a "minor dispute is subject to a compulsory and binding arbitration before an adjustment board established by the employer and the unions representing the employees," thus relieving the district court of subject matter jurisdiction to decide the dispute. *See Int'l Ass'n. of Machinists & Aerospace Workers v. U.S. Airways, Inc.*, 358 F.3d 255, 260 (3d Cir. 2004). *See also Conrail*, 491 U.S. at 303-04; *Assoc. of Flight Attendants, AFL-CIO v. Horizon Air Indus., Inc.*, 280 F.3d 901, 904 (9th Cir. 2002) ("[f]ederal courts do not have jurisdiction to

resolve minor disputes"); *BMWE I,* 19 Fed. Appx. 731, at *4 ("[t]he arbitral remedy provided in 45 U.S.C. § 153 is mandatory and exclusive for minor disputes").

The line between whether a dispute is major or minor "looks to whether a claim has been made that the terms of an existing agreement either establish or refute the presence of a right to take the disputed action. The distinguishing feature of such a case is that the dispute may be conclusively resolved by interpreting the existing agreement." *Conrail*, 491 U.S. at 305. Thus, major disputes "relate to the formation of collective bargaining agreements or efforts to secure them," while minor disputes "grow out of grievances or out of the interpretation or application of agreements covering rates of pay, rules, or working conditions." *Hawaiian Airlines, Inc. v. Finazzo*, 512 U.S. 246, 252 (1994) (internal quotations omitted).

Here, UP asserts that its conduct–transferring the work to a plant where the applicable CBA allows a third party to do the work–is authorized under the Feb. 7th Agreement. "Where an employer asserts a contractual right to take the contested action, the ensuing dispute is minor if the action is arguably justified by the terms of the parties' collective bargaining agreement. Where, in contrast, the employer's claims are frivolous or obviously insubstantial, the dispute is major." *Conrail*, 491 U.S. at 307. Consequently, the issue before me is whether, interpreting the Feb. 7th and UP Proper Agreements together, it is arguably justifiable for UP to transfer the production of pre-plated rail ties and track panels and panel kits to a plant in the Southern Division, where the production was done by non-BMWED-represented employees as was acceptable under the CBA applicable to that plant.

As a preliminary matter, UP argues that because Judge Nottingham found that he did not have jurisdiction to determine whether "to interpret the Fishgold Award and the CBA to mean that the Fishgold Award is moot in light of the transfer of work." (*BMWED II*, at 12-13 n. 5,) collateral estoppel applies and prevents the parties from relitigating whether their dispute is minor.

In this Circuit, a party seeking to rely on collateral estoppel must establish that: (1) the issue previously decided is identical with the one presented in the action in question, (2) the prior action has been finally adjudicated on the merits, (3) the party against whom the doctrine is invoked was a party, or in privity with a party, to the prior adjudication, and (4) the party against whom the doctrine is raised had a full and fair opportunity to litigate the issue in the prior action. *Dodge v. Cotter Corp.*, 203 F.3d 1190, 1198 (10th Cir. 2000).

Because Judge Nottingham did not decide the identical issue, collateral estoppel does not apply. Although the transfer of work under the Feb. 7th Agreement was mentioned before Judge Nottingham, the issue of whether the Feb. 7th Agreement allowed UP to transfer work to non-BMWED-represented employees was at best raised on a theoretical basis. BMWED, at least, appears to have been under the impression that all the transferred work would still be done by BMWED-represented employees. (*See* Def.'s Ex. F, at 4-5.) In any case, Judge Nottingham's decision does not indicate that he decided the precise issue before me: whether UP's interpretation of the Feb. 7th Agreement–allowing it to transfer work to non-BMWED-represented employees–is "arguable." Accordingly, the doctrine of collateral estoppel does not apply, and I will

address the question on the merits.

It is clear that the parties dispute involves "the interpretation or application of existing labor agreements," *Finazzo*, 512 U.S. at 256, and that it must be "resolved by interpreting the existing agreement." *Conrail*, 491 U.S. at 305. *See also BNWED I*, 19 Fed. Appx. at 731 ("because the dispute here [involving the same Rule 9 at issue this case] can be resolved by application and interpretation of the existing collective bargaining agreement, it is a minor dispute"). The Feb. 7th Agreement states that a carrier such as UP "shall have the right to transfer work and/or transfer employees throughout the system which do not require the crossing of craft lines." (Naro Decl., Ex. 3, at 3.) The Feb 7th Agreement therefore appears to authorize UP to transfer work to the North Little Rock Facility. Indeed, BMWED admits that such a transfer would be permissible were the work done by BMWED-represented employees covered by a different CBA, such as the MPRR; in other words BMWED appears to concede that, construing the UP Proper Agreement and the Feb. 7th Agreement together, UP was entitled to transfer the work away from BMWED employees covered by the UP Proper Agreement. (Pl.'s Mem. in Opp., at 7.) Furthermore, BMWED does not appear to dispute UP's contention that the purchase of pre-plated ties, produced by non-BMWED member, is authorized under the MPRR.

Consequently, the determinative issue is whether UP's argument that transferring the work to a plant where the relevant CBA allowed non-union members to do the work does not constitute "crossing of craft lines," prohibited under the Feb. 7th Agreement, is frivolous or obviously insubstantial. The parties appear to agree that this

9

language prevents UP from transferring work from one union to another. However, UP argues that the language does not apply to the situation here because it "never sent this work to a different union. Instead, the work went from one BMWED agreement, the UP Agreement...to another BMWED agreement, the MPRR Agreement." (Def.'s Reply, at 6.)

The question is somewhat close, but it is well-established that if there is any doubt whether a dispute is major or minor, a court should deem the dispute minor. *See CSX Transp., Inc. v. Bhd. of Maint. of Way Emp.*, 327 F.3d 1309, 1321 (11th Cir. 2003); *Bhd. of Maint. of Way. Emp. v. Burlington N. Santa Fe. R.R.*, 270 F.3d 637, 639 (8th Cir. 2001); *Bhd. of Maint. of Way Emp. v. Atchison, Topeka & Santa Fe. Rwy Co.*, 138 F.3d 635, 643 (7th Cir. 1997); *Hirras v. Nat'l R.R. Passenger Corp.*, 10 F.3d 1142, 1145 (5th Cir.), *vacated on other grounds*, 512 U.S. 1994); *Gen'l Comm. of Adjustment, United Transp. Union, W. Md. R.R. Corp. v. CSX R.R. Corp.*, 893 F.2d 584, 591 (3d Cir. 1990) *Dement v. Richmond, Fredericksburg & Potomac R.R. Co.*, 845 F.2d 451, 463 (4th Cir.1988); *Watts v. Union Pacific R. Co.*, 796 F.2d 1240, 1245 (10th Cir. 1986). Here, UP's argument that the Feb. 7th Agreement prohibits only those transfers of work that involve transferring work from one set of its employees, who are represented by one union, to another set of its employees, who are represented by a different union, is an arguable interpretation of the Feb. 7th Agreement. As a result, I lack jurisdiction over BMWED's claims, and UP's motion to dismiss should be granted upon condition of

referring the matter to arbitration.[3]

2.   <u>Motion for Preliminary Injunction</u>

UP moves for an order preliminarily enjoining BMWED from striking pending arbitration of their dispute under the provisions of the RLA. BMWED argues that a preliminary injunction in inappropriate, but that should I grant UP's motion, I should condition the injunction upon UP submitting the dispute to the Fishgold Board.

Standard of Review

Because a preliminary injunction is an extraordinary remedy, the right to relief must be clear and unequivocal." *Greater Yellowstone Coalition v. Flowers,* 321 F.3d 1250, 1256 (10th Cir.2003). *See also SCFC ILC, Inc. v. Visa USA, Inc.*, 936 F.2d 1096, 1098 (10th Cir. 1991). The decision to grant injunctive relief is a matter of discretion. *Id.*

The parties dispute whether this case is governed by the standard generally applicable to a preliminary injunction under Fed. R. Civ. P. 65, or that applicable under the Norris LaGuardia Act (NLGA), 29 U.S.C. §§ 101-115, which governs injunctions entered in labor disputes. *See Delta Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l*, 238 F.3d 1300, 1305 (11th Cir. 2001) ("[i]n cases where a carrier seeks injunctive relief against a union, a court must look not only to the RLA, but also to the [NLGA]"). The standards are similar; to obtain preliminary injunctive relief in this Circuit under Rule 65,

---

[3]In its second claim, BMWED asserts that UP's December 2, 2003 notice invoking the Feb. 7th Agreement was itself a binding commitment. However, it provides no argument that the major/minor dispute analysis should be different with regards to this claim.

the moving party must establish: (1) a substantial likelihood of prevailing on the merits; (2) irreparable harm unless the injunction is issued; (3) that the threatened injury outweighs the harm that the preliminary injunction may cause the opposing party; and (4) that the injunction, if issued, will not adversely affect the public interest." *Valley Comty Pres. Com'n v. Mineta*, 373 F.3d 1078, 1083 (10th Cir. 2004). Under the NLGA, an injunction may not issue unless the court finds:

> (a) That unlawful acts have been threatened and will be committed unless restrained or have been committed and will be continued unless restrained . . .; (b) That substantial and irreparable injury to complainant's property will follow; (c) That as to each item of relief granted greater injury will be inflicted upon complainant by the denial of relief than will be inflicted upon defendants by the granting of relief; (d) That complainant has no adequate remedy at law; and (e) That the public officers charged with the duty to protect complainant's property are unable or unwilling to furnish adequate protection.

29 U.S.C. § 107.[4]

Because of the similarity of the standards, I need not decide which is applicable as I will consider the applicability of each standard at the same time.

### Discussion

---

[4]§ 107 also requires that an injunction be granted after "hearing the testimony of witnesses in open court." However, the parties have stipulated to the relevant facts, and agreed to proceed without the presentation of live testimony. Courts have found that the NGLA authorizes granting an injunction despite the absence of live testimony in circumstances such as this where there is no dispute of fact. *See Delta Air Lines, Inc. v. ALPA, Int'l*, 238 F.3d 1300, 1310 (11th Cir. 2001) (reading section as a whole, "the purpose of section 107 is not so much about requiring live testimony, then, as it is about ensuring the presence of reliable evidence before a court may enjoin parties to a labor dispute," and finding no error where both sides presented sworn affidavits and a host of other evidence and testimony that was largely undisputed); *United Telegraph Workers, AFL-CIO v. Western Union Corp.*, 771 F.2d 699, 705 (3d Cir. 1985) (citing cases where courts excused Section 107's requirements based on undisputed facts).

A.      Likelihood of Success on the Merits/ Risk of Unlawful Acts

UP argues that it is entitled to an order enjoining BMWED from striking because their dispute is "minor," as opposed to "major," under the RLA. *See Conrail*, 491 U.S. at 304 (*citing Trainmen v. Chicago R. & I.R. Co.* ("*Chicago River*"), 353 U.S. 30 (1957)) ("Courts may enjoin strikes arising out of minor disputes"). *See also BMWED I*, 19 Fed. Appx. at 731 (same). As discussed above, I agree that the dispute is minor, and therefore a strike would be unlawful. *CSX Transp., Inc. v. United Transp. Union*, 879 F.2d 990, 997 (2d Cir. 1989) (citing cases). Likewise, it is undisputed that BMWED will strike unless I issue an injunction, or UP concedes to certain demands. Consequently, UP has met the first prong required under both Rule 65 and the NGLA.

Nonetheless, BMWED argues that UP is not entitled to an injunction because it have not made every reasonable effort to resolve the dispute through voluntary arbitration, as required under Section 8 of the NGLA.

Section 8 provides:

> No restraining order or injunctive relief shall be granted to any complainant who has failed to comply with any obligation imposed by law which is involved in the labor dispute in question, or who has failed to make every reasonable effort to settle such dispute either by negotiation or with the aid of any available governmental machinery of mediation or voluntary arbitration.

29 U.S.C.A. § 108. The parties dispute whether Section 8 even applies to cases under the RLA. In *Brotherhood of Railroad Trainmen v. the Denver & Rio Grande Western Railroad Company*, 290 F.2d 266, 270 (10th Cir. 1961), relying on *Chicago River*, 353 U.S. 30, the Tenth Circuit succinctly rejected an argument that Section 8 prohibited

entry of an injunction prohibiting a railroad's employees from striking, finding that the NGLA "did not prevent injunctions to prohibit strikes growing out of minor disputes which were specifically dealt with in the [RLA]." The Tenth Circuit has never revisited this issue, and consequently the binding law in this Circuit appears to be that Section 8 does not apply to anti-strike injunctions authorized under the RLA.

However, even assuming Section 8 may be applied in RLA cases, I do not agree that it prohibits an injunction in this case. Under Section 8 an injunction is forbidden "[i]f a complainant has failed (1) to comply with any obligation imposed by law or (2) to make every reasonable effort to settle the dispute." *Bhd. of Railroad Trainmen, Enterprise Lodge, No. 27, v. Toledo, P. & W. R. R.* ("*Toledo*"), 321 U.S. 50, 56-57 (1944). BMWED does not indicate that UP has failed to comply with any obligation imposed by law, but argues that it has failed to make every reasonable effort to settle the dispute.

In *Toledo*, which predated *Chicago River*, the Court held that Section 108 precluded granting a railroad's motion for injunctive relief because it simply refused to arbitrate the matter. *Id.* at 64. The facts in this case, however, are distinguishable. According to Wayne Naro, UP's Director of Labor Relations, after he received a copy of Judge Nottingham's January 2005 decision dismissing BMWED's claims and remanding their disputed issues to Arbitrator Fishgold, BMWED made no effort to arbitrate. He asserts that UP has informed BMWED that it stands ready to arbitrate those issues as ordered by Judge Nottingham.

Furthermore, although BMWED purports to be the aggrieved party, and it did not

14

seek arbitration but filed this suit. BMWED cannot be heard to complain that UP's failed to initiate arbitration, when BMWED initiated proceedings to determine the issues in an alternate forum, namely this court.

It is true that, by letter dated June 3, 2005–several months after this suit was filed–BMWED offered to arbitrate all the disputed issues before Arbitrator Fishgold and to dismiss this suit.[5] On June 7, 2005, UP responded, agreeing to arbitrate but refusing to arbitrate all of the issues before Arbitrator Fishgold, arguing that not all of the parties' disputes were within his jurisdiction. (Tanner Decl., Ex. 3.)

I am not convinced that UP's refusal to arbitrate on the condition that BMWED's demand that all matters are submitted to the Fishgold Board is unreasonable. The NGLA–as well as the RLA–create a duty on the part of the parties to negotiate in good faith. *Bhd. of Maintenance of Way Employees v. Union Pacific R.R. Co.* ("*Union Pacific*"), 358 F.3d 453, 457 (7th Cir. 2004). However, this duty does not include a requirement that the carrier "agree to arbitrate the dispute through the fastest and most effective means available." *Id.* In *Union Pacific*, the court found that the railroad's refusal to alter the parties agreed upon arbitration procedure and implement new, expedited arbitration procedures, was not unreasonable. *Id.* The court held that the railroad was required to "make every *reasonable* effort, not every *conceivable* one," and

---

[5] UP argues that these letters should be excluded under Fed. R. Evid 408, which prohibits admission of evidence of compromise or efforts to compromise for purposes of establishing liability for or invalidity of a claim or its amount. Because BMWED is offering this evidence to demonstrate UP's lack of good faith, as opposed to whether it has violated the RLA by unilaterally amending the CBA, this evidence is admissible under Rule 408. *See id.* ("[t]his rule also does not require exclusion when the evidence is offered for another purpose").

therefore the union was not entitled to force the railroad to either accede to its demands or allow it to strike. *Id.* (emphasis in original).

Here, I likewise find that UP did not act unreasonably by rejecting arbitration solely on BMWED's terms, after BMWED had already filed suit. BMWED appears to be using this case, and the threat of strike, to obtain arbitration on its terms. Under these circumstances, an injunction is necessary to enforce compliance with the requirements of the RLA, and, conditional injunctive relief is warranted. *See Chicago River*, 353 U.S. at 41.[6]

2. <u>Irreparable Harm</u>

BMWED concedes that UP faces irreparable harm, and that it lacks a remedy at law because it would have no action for damages. *See* 29 U.S.C. § 107(b) & (c).

3. <u>Balance of Injuries</u>

UP provides evidence indicating that its entire operations could be brought to a halt because of BMWED's threatened strike, combined with other unions' refusal to cross the picket line. As a result, UP avers that it would suffer millions of dollars of harm from lost revenue, train delay, and penalty payments, and that its commuter operations in Chicago would be affected, inconveniencing hundreds of thousands of

---

[6]I do note that although the parties have negotiated over this dispute, formal arbitration over the specific issues in this case has not yet been initiated. *See Manion v. Ks. City Terminal Ry. Co.*, 353 U.S. 927, 927 (1957). However, as noted above, it is not clear to me that UP can be blamed for not initiating arbitration of the issue when the dispute was pending in this court based on the actions of BMWED, the aggrieved party. However, this concern may be rectified by conditioning the granting of UP's motion upon it submitting these matters to arbitration under the RLA within a reasonable time. *See id.*

16

commuters.  Furthermore, it notes while it is not entitled to damages for an illegal strike, BMWED would be entitled to damages should it be determined that UP was not entitled to install ties pre-plated by Nevada Railroad personnel.  Finally, UP notes that it has, at least for now, has changed its operations such that all pre-plated ties installed on the UP Proper are produced by BMWED-represented employees.  (June 27, 2005 Naro Decl., ¶¶ 5-6.)

BMWED responds that a strike will only occur if UP refuses to refer the disputed matters to the Fishgold Board, and that UP faces no harm should the matters be so referred.  Likewise, BMWED asserts that it will be faced with harm due to further delay and the possibility of inconsistent results should the issues be split between the Fishgold Board and another arbitration board or boards.

I find that the balance of injuries weighs in favor of granting the injunction.  While it is undisputed that UP faces irreparable harm should BMWED initiate a strike, on the record before me, BMWED faces little, if any, irreparable harm should an injunction occur, particularly if made conditional.  In particular, UP changed its operations at its North Little Rock Plant to essentially comply with BMWED's interpretation of the Rule 9 and Feb. 7th Agreements.  BMWED notes that UP retains the right to change this; however, using my equitable powers, I am entitled to exercise my equitable powers to protect BMWED by conditioning my issuance of the injunction on the requirement that UP continue to install on the UP Proper only pre-plated ties that were produced by BMWED-represented employees.  *See Bhd. of Locomotive Engineers v. Missouri-Kansas-Texas R. Co.,* 363 U.S. 528, 531 (1960) (under traditional equitable

considerations, district court may condition granting of anti-strike injunction on railroad's maintaining status quo during arbitration).

BMWED also argues that it faces the possibility of inconsistent decisions if I do not order that all pending issues are remanded to the Fishgold panel. In addition, reference to a panel with familiarity of the issues preserves arbitration resources and leads to more efficient resolution. Under these circumstances I find it appropriate for me to again exercise my equitable powers to condition dismissal and injunctive relief on remand of this matter to Fishgold panel.

4.      Public Interest

UP argues that the public interest is best served by maintaining the transportation of goods and people without interruption. I agree. As noted by the Tenth Circuit, the primary purpose of the RLA was"was to avoid interruption of commerce by promoting industrial peace, stabilizing the relationship between labor and management, and eliminating, as far as possible, the danger of strikes on the nation's railroads." *Bhd. of R.R. Trainmen*, 290 F.2d at 270. I find that granting UP's motion for a preliminary injunction would further, rather than impair, the public interest.

Finding that all the factors weigh in favor of an injunction under either standard,[7] I conclude that UP's motions should be conditionally granted.

Accordingly, it is ordered:

---

[7]BMWED does not argue, in either its response to UP's motion or its proposed draft order, that UP cannot demonstrate the final factor required under the NGLA, and therefore appear to concede that public officers "are unable or unwilling to furnish adequate protection." 29 U.S.C. § 107.

1. Defendants' Motion to Dismiss For Lack of Subject Matter Jurisdiction, filed April 27, 2005 (Docket # 7) is denied as moot;

2. Defendant's Motion for a Preliminary Injunction, filed April 18, 2005 (Docket # 3) and Motion to Dismiss (Docket #16) are granted upon the following conditions:

    a. The parties submit the issues in dispute to the special board of adjustment known as the Fishgold board or panel within 20 days of the date of this order;

    b. Defendant shall continue to require that any pre-plated ties installed on the UP Proper be pre-plated by employees represented by Plaintiff;

3. The terms of this injunction are that Plaintiff, its officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with it who receive actual notice of the order by personal service or otherwise, are hereby preliminarily enjoined from calling, supporting permitting, instigating, authorizing, encouraging, participating in, approving, or sanctioning any strike, work stoppage, slowdown, concerted refusal to work pending the Fishgold board's decision of these matters or further order from this court;

4. By November 28, 2005, the parties shall file a joint status report advising me whether:

    a. the issues have been submitted to the Fishgold board;

      b. any other matter remains to be decided by me; and

      c. this case may be closed.

DATED at Denver, Colorado, on October 26, 2005.

BY THE COURT:

/s/ Walker D. Miller  
United States District Judge